**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEITH LYNN PETRY,** | : | **Civil No. 3:09-CV-2312** |
| | : | |
| **Plaintiff,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM OPINION</u>**

## I.   <u>Introduction</u>

This case, which comes before the Court on a motion for summary judgment, presents questions concerning: (1)  the extent to which inmates forfeit their right to be free from excessively dangerous conditions simply by virtue of volunteering to undertake work assignments in prison; and (2) whether providing flammable clothing to inmates who work in a prison furnace falls within any recognized exception to the state's sovereign immunity from tort liability. On the facts of this case, we conclude that the Plaintiff's constitutional claims are not barred as a matter of law by the mere fact that he may have agreed to work at this furnace. Similarly, we find that, on the unusual facts of this case, the Defendants are not entitled to summary judgment on their sovereign immunity claim.

## II.     Statement of Facts and of the Case

### A.     Factual Background

This case arises out of a November 28, 2007, incident in which it is alleged that clothing worn by an inmate, Keith Lynn Petry, who was working in the prison furnaces at SCI-Huntingdon, spontaneously ignited, causing serious burns and injuries to the Plaintiff. This clothing was provided to Petry by the Defendants, and it is alleged that those Defendants were aware that these clothes had in the past burst into flames when exposed to the intense heat of the prison furnaces, a contention which the Defendants dispute.

With respect to this incendiary incident, the pending motion for summary judgment reveals both areas of complete factual consensus, as well as matters which are the subject of heated factual dispute. At the outset, it is undisputed that, at the time of this incident, SCI-Huntingdon was heated by four large coal burning boilers, which were located in the boiler room of the prison powerhouse. (Doc. 28, Williams Decl. ¶ 4; Petry 28:15-23.) Inmates who worked in the powerhouse "pit crew" were responsible for feeding the boilers with coal, raking the coal, and removing the ash. (Doc. 28, Williams Decl. ¶ 5; Petry 31:22-32:12.) Raking the coals involved spreading the coals evenly in the furnace as they burned to cover over blowholes to maintain steam pressure. In 2007, inmates raked the coals with a long rake through

2

a small door in the side of the boilers. (Doc. 28, Williams Decl. ¶¶ 6-7; Petry 32:20-33:22.) The inmate pit crew duties have remained fundamentally the same since the 1980's. (Doc. 28, Petry Dep. 52:3-17.)

While the parties agree regarding the fundamental duties of furnace pit crew inmates, they dispute whether inmates volunteer to expose themselves to all of these work conditions on the pit crew. For their part, the Defendants insist as a general matter that inmates are permitted to work certain designated inmate jobs within SCI-Huntingdon. Placement of inmates in jobs is coordinated by the Inmate Employment Office. (Doc. 28, Hick-Kern Decl. ¶¶ 3-4.) As part of this process, inmates choose the jobs they wish to work by signing up for the job on prison's Work Reserve List. The Work Reserve List is a list of all inmates within the institution who are seeking employment at a specific job. Each inmate job has its own Work Reserve List. The longer an inmate waits on the list, the higher his name rises on the list in proportion to the other names. (Doc. 28, Hicks-Kern Decl. ¶ 5; Petry Dep. 51:3-24, 24:10-23, 25:7-9.) Thus, in order to be eligible to work in the powerhouse, an inmate must first volunteer to work in the powerhouse by putting his name on the powerhouse's Work Reserve List, and then wait until his name reaches the top of the list. (Doc. 28, Hicks-Kern Decl. ¶ 11.) No inmate would be assigned to work in the powerhouse who did not request that assignment. (Doc. 28, Hicks-Kern Decl. ¶ 16; Petry Dep. 51:20-24.)

3

While apparently acknowledging the existence of this job bidding process at SCI Huntingdon, Petry contests that inmates had any real choice over the specific conditions of their work on the pit crew, alleging that "they tell you how to work or you go in the hole." (Doc. 30, Petry Dep. 24:3-5.) Further, Petry stated "If you work on a job and they want you to do something that you don't want to do because you feel it is too dangerous, the first thing they will say is well, we'll write you up and go to the hole and then go for parole. It's kind of their way of, you know, kind of coercing you into doing something that you don't want to do." (Doc. 30, Petry Dep. 66:13-22.) Petry's statements were echoed by a second inmate, Richard Carion, who stated that a refusal to work would result in an inmate being served with a DC-141 Misconduct Report charging an inmate with refusing to obey a direct order from staff, and they were "ordered to continue working." (Doc. 30, Exhibit A - Affidavit of Richard Carion, p. 2, 3.)

Although, the record reflects this factual dispute concerning the degree to which inmates were able to make voluntary choices regarding their work assignments, and work conditions, there appears to be broad agreement regarding the factual conditions of work on the prison boiler pit crew. It is undisputed that inmates on the pit crew performed their duties in conditions of intense heat. Indeed, during furnace operations, Curtis Williams, the Corrections Utilities Supervisor, estimated that the

4

temperature inside the boiler was 2,300 degrees. (Doc. 30, Williams Dep. 20:19-21.) In order to protect themselves from the intense heat of these boilers, inmate pit crew members would often change into second-hand clothes offered by prison officials before working in the furnaces. The powerhouse provided inmates with these work clothes, which were typically older clothes given to the powerhouse by the laundry department. (Doc. 28, Williams Decl. ¶ 8.) Prior to starting their furnace shift, inmates could change into these work clothes. No inmate was required to wear the work clothing, but as a practical matter the intense heat of the boilers often compelled inmates to don additional clothing. (Doc. 28, Williams Decl. ¶ 8.; Petry Dep. 72:8-20.) Given the cast-off quality of the pit crew work clothes, it is undisputed that the clothes often consisted of worn garments, described by the Plaintiff as "old ripped up coats." (Doc. 30, Petry Dep. 36:16.)

Yet, while the duties and attire of inmate pit crew team members are largely undisputed, the extent of prior knowledge regarding the consequences which flowed from wearing these worn garments, without any other form of fire retardant, in the presence of the scorching heat of the prison boilers is the subject of great dispute. On one hand, the Plaintiff paints a stark portrait of the known nature of these risks. Indeed, Petry–who has been housed in SCI Huntingdon at various times over the span of many years– testified that he was aware of coats catching on fire as far back as the

1980's. (Doc. 30, Petry Dep. 43:23.) He also saw shirts catch on fire. (Doc. 30, Petry Dep. 44:7.) Petry further stated "Just about anybody who worked there in the pit caught fire at one time or another." (Doc. 30, Petry Dep. 84:24-84:1.) According to Petry, he complained to Defendants, Honstine, Lynn, and Williams. (Doc. 30, Petry Dep. 87:5-7.) Petry alleges that Lynn, Honstine, and Williams all acknowledged these risks, told him that they had brought the problem of the clothing catching fire to Lt. Kitchen a year or a year and a half before November 28, 2007, (Doc. 30, Petry Dep. 130:17-25; 131:1-3), and advised him that they had requested more suitable protective clothing for pit crew. (Doc. 30, Petry depo. 131:10-22.)

Petry's claims are supported, in part, by prison medical records. These records reveal that Petry's shirt had previously ignited and caught on fire in September of 2006 while he was working on the pit crew, resulting in second degree burns to his arm and ear. (Doc. 30, Exhibit F - Prison Medical Records.) Petry's allegations regarding the known danger of clothing fires are further buttressed by an affidavit submitted by another inmate, Richard Carion. Inmate Carion alleges that:

> For many months prior to November 28, 2007, inmates employed by the SCI-Huntingdon Power House, including myself, had been complaining of flames rising from the boiler when the coal was being raked. These complaints were made to the Power House supervisors, including supervisor Harry Lynn, Russell Reed, James Honstine, and utilities Plant Manager, Curtis Williams. The above-mentioned Power House supervisors provided workers' with a mask, similar to a welder's mask,

6

as well as gloves, similar to those used for welding as well. Inmates were not provided full protection from sparks or flames. Instead they were instructed or ordered to utilize a corduroy jacket issued for winter use by the general population. Boiler temperatures were very hot and sparks would shoot out of the boiler. Workers, including myself and Mr. Keith Petry, complained again and again that we were fearful of catching on fire while raking the coal.

(Doc. 30, Affidavit of Richard Carion, p. 1).

Inmate Carion also confirmed at least one prior incident in which Petry's

clothing had ignited while working in the prison boilers, and alleged that prison

officials were subjectively aware of this danger, stating that:

There was a first incident with Mr. Petry getting burned while raking the fire in the boiler which occurred several months before the incident of November 2007. Immediately after this first incident, many inmates, including myself, were again complaining of the working conditions and the risks of catching on fire unless proper protective clothing was provided. Within weeks of the first incident, I was told by Power House Supervisors, Lynn, Reed, and Honestine, that they had received full body non-flammable suits but chose to keep them locked in their office. More specifically, they were kept in the Power House supervisor's office. Inmate workers, including myself, inquired about the suits but were ordered to continue working without the suits as we had been told to do so previously. We were told that if an emergency arised that they could utilize the suits and that they would then be available for use by inmates working in the Power House. On November 28, 2007 Mr. Petry was then involved in another, second accident where he was burned severely. All of the Power House workers, including myself, were shocked and did not wish to continue working without the proper attire. I was told that if I refused to work that I would be served with a DC-141 Misconduct Report stating that I refused to obey a direct order from staff.

(Id. pp.2-3.)

In contrast, the individual Defendants all denied any knowledge of, reports of, or complaints of, inmate clothing spontaneously combusting prior to November 28, 2007.

## B.    Procedural History

On November 24, 2009, Petry filed this civil action in the United States District Court for the Middle District of Pennsylvania. (Doc.1.) In his complaint, Petry initially named ten Defendants. These Defendants included: Jeffrey Beard, the Secretary of the Department of Corrections in November 2007; Raymond Lawler, the Superintendent at SCI-Huntingdon in November 2007; Michael Harlow, the Deputy Superintendent at SCI-Huntingdon; Kevin Kauffman, the Captain of Security at SCI-Huntingdon; Tim Yutzy, the Corrections Institution Safety Manager at SCI-Huntingdon from December 1992 through June 2008; Charles Kitchen, the Tool Control Officer at SCI-Huntingdon; Curtis Williams, the Corrections Utility Supervisor at SCI-Huntingdon since May 2004; James Honstine, a utility plant operator at SCI-Huntingdon for the past 22 years; Russell Reed, a utilities plant operator at SCI-Huntingdon for 8 years; and Harry Lynn, the utility plant mechanic at SCI-Huntingdon for the past ten years.

Petry's complaint brought both constitutional and common law tort claims against the Defendants. At the outset, Petry alleged that the actions of prison officials,

placing him in flammable clothing in the prison boiler room, knowing of the risk that the clothing provided to inmates could spontaneously combust, constituted deliberate indifference to the health and safety of the prisoners and rose to the level of a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. (Doc. 1.) In addition, to this constitutional tort, Petry argued, in the alternative, that the acts of prison officials were negligent and gave rise to common law tort liability under state law. (Id.)

Following the completion of discovery in this case, the Defendants filed a motion for summary judgment in this case, which sought dismissal of all claims and Defendants in this lawsuit. (Docs. 25-28.) The Plaintiff responded to this motion by conceding that some claims and parties should be dismissed, while contesting the motion for summary judgment as to other claims and parties. (Doc.30.) In particular, Petry contested the Defendants' claim that his willingness to work in the prison boiler pit crew defeats any Eighth Amendment claim since Petry is alleged to have voluntarily chosen to work in this setting. Further, Petry insisted that the negligence of prison staff, who garbed him in flammable clothing, falls within an exception to the general rule of sovereign immunity.

This summary judgment motion is now fully briefed and ripe for resolution. (Docs. 27, 30, and 31.) For the reasons set forth below, the motion will be granted,

in part, with respect to Petry's claims arising under the Pennsylvania Constitution, and with respect to all of Petry's claims against Supervisory Defendants Beard, Lawler, Harlow, Kauffman, and Yutzey. The Defendants' motion will be denied, however, as to Petry's remaining Eighth Amendment and common law tort claims.

## III.   Discussion

### A.   Summary Judgment, Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).   The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is

genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider

all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

> **B.    The Supervisory Defendants– Beard, Lawler, Harlow, Kauffman, and Yutzey– Are Entitled to Summary Judgment**

At the outset, it is clear that the prison Supervisory Defendants–Defendants Beard, Lawler, Harlow, Kauffman, and Yutzey–are all entitled to summary judgment in this case.  Fairly construed, Petry's allegations as to these Supervisory Defendants are little more than allegations of *respondeat superior* liability. These allegations are insufficient to state a claim upon which relief can be granted. Indeed, to the extent that Petry attempts to hold these officials personally culpable based simply upon their supervisory status, his complaint runs afoul of the settled rule that civil rights liability may not be based solely upon notions of *respondeat superior* A claim of a constitutional deprivation cannot be premised merely on the fact that the named Defendant was a prison supervisor when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants deprived him of a right secured by the Constitution or laws of the United States. <u>See also</u> <u>Maine v.Thiboutot</u>, 448 U.S. 1 (1980).

In particular, with respect to prison supervisors it is well-established that:

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed in this context:

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. Because vicarious liability is inapplicable to [civil rights]. . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009)(citations omitted).

In this case, the Supervisory Defendants are not alleged to have directly participated in the events set forth in Petry's complaint. Therefore, to the extent that the complaint attempts to hold these officials personally culpable based simply upon their supervisory status, Petry acknowledges that this complaint runs afoul of the settled rule that civil rights liability may not be based solely upon notions of

*respondeat superior*, and concedes that his claims against these Defendants must be dismissed. (Doc. 30, pp.9-10.)[1]

### C.    Petry Cannot Maintain a Claim For Damages Arising Under the Pennsylvania Constitution

Further, to the extent that Petry sought damages based upon an implied private right of action conferred to him by Pennsylvania's constitution, it must be noted that:

> Pennsylvania law does not include a statutory equivalent to 42 U.S.C. § 1983, which provides a cause of action for damages because of a federal constitutional violation. Moreover, the question of whether the Pennsylvania Constitution provides a cause of action for damages remains unanswered. Underwood v. Beaver Cnty. C.Y.S., Civ. A. No. 03-1475, 2005 U.S. Dist. LEXIS 23012, at *7 (W.D.Pa. Oct. 7, 2005). Nevertheless, a majority of other district courts in this circuit that have decided the issue have concluded that money damages are not available for claims under the Pennsylvania Constitution. See Ryan v. General Machine Prods., 227 F.Supp.2d 585, 595 (E.D.Pa.2003) (stating that federal courts in the Court of Appeals for the Third Circuit have concluded that there is no right to money damages under the Pennsylvania Constitution); see also Douris v. Schweiker, 229 F.Supp.2d 391, 405 (E.D.Pa.2002); Lees v. West Greene Sch. Dist., 632 F.Supp. 1327, 1335 (W.D.Pa.1986). Although monetary relief is unavailable, "other remedies, such as declaratory or injunctive relief ... are ... remedies under the Pennsylvania Constitution." Jones v. City of Philadelphia, 890 A.2d 1188, 1215-16 (Pa.Commw.Ct.2006) (discussing the lack of a cause of action for damages under the Pennsylvania Constitution and declining, "without benefit of legislative action," to create such a cause of action.).

---

[1] Petry likewise concedes that he may not maintain any Monell claims in this setting, and agrees to the dismissal of all such claims. (Doc. 30, pp.9-10.)

O'Hara v. Hanley, No. 08-1393,  2009 WL 2043490, 9 (W.D.Pa. July 8, 2009).

Thus, as Petry himself now concedes, there appears to be growing consensus that the Pennsylvania Constitution simply does not provide legal footing for any damages claims like those made by Petry in this case. (Doc. 30, pp.9-10.) Therefore, Petry's private cause of action for damages premised on the Pennsylvania constitution must also be dismissed.

### C.  Disputed Factual Issues Preclude Summary Judgment on Petry's Eighth Amendment Claims and Those Claims Do Not Fail As a Matter of Law Simply Because Petry Consented to Work in the Prison Boiler

In this case, the gravamen of Petry's complaint is that prison officials violated his rights under the Eighth Amendment to the United States Constitution by displaying "deliberate indifference" to his safety when they exposed him to an unacceptable workplace danger by permitting him to work in flammable clothing in the prison boiler, where it is alleged that there was a known risk that inmate clothing would spontaneously combust. Petry faces an exacting burden in advancing this Eighth Amendment claim against prison officials in their individual capacities. To sustain such a claim, he must:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825,

15

834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001). In Beers-Capitol v. Whetzel, the Third Circuit explained the basic requirements of a claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

Id. at 125 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety." Id. As discussed more fully below, this deliberate indifference standard "is a subjective standard under Farmer – the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id.

As explained in Beers-Capitol, in cases based on allegations of deliberate indifference on the part of prison officials, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official

16

actually knew rather than what a reasonable official in his position would have known." Id. at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'" Id. (quoting Farmer, 511 U.S. at 837). This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer, 511 U.S. at 837).

At the same time, this subjective standard does not insulate officials from liability where such officials choose to remain deliberately indifferent to an excessive or substantial or serious risk of harm to inmates. The Supreme Court explained:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Farmer, 511 U.S. at 842. The Supreme Court also noted that a supervisory defendant's knowledge of a risk may be proved through circumstantial evidence, so

that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.  Although the Third Circuit has recognized that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim, see, e.g, Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005), the Third Circuit did interpret Farmer to signal that "a plaintiff could make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation[.]" However, in order to show deliberate indifference in this fashion, a plaintiff would need to come forward with evidence to showing a substantial basis for demonstrating that a prison official was deliberately indifferent in the face of information or indicators that presented a substantial risk to inmate safety.  See Farmer, 511 U.S. at 842-43 ("If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence would permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (emphasis added).

Even where a plaintiff has presented sufficient evidence to allow a factfinder to reach the inference that a prison official had knowledge of the risk on the basis that

risk was obvious, it is clear that an inference may not be compelled, and that the prison official must be permitted to show that he was actually unaware of the risk in question.  Beers-Capitol, 256 F.3d at 132.  Lastly, a prison official who is shown to have been actually aware of a risk to a prisoner-plaintiff can avoid liability if he shows that he responded reasonably to the risk, even if the response did not avoid the ultimate harm.  Id.

These general guiding constitutional principles have been applied by the courts in a series of cases involving inmate allegations that correctional staff exposed prisoners to dangerous and unsafe physical conditions inside a prison. See e.g., Innis v. Wilson, 334 F.App'x 454 (3d Cir. 2009)(Eighth Amendment claim resulting from injuries from prison table collapse); Vidaurri v. Buss, No. 09-580, 2010 WL 625016 (N.D. Ind. Feb. 11, 2010)(Eighth Amendment claim resulting from injuries from prison ceiling collapse); Bennett v. Philadelphia, No. 07-2794, 2008 WL 4211701 (E.D. Pa. Sept. 9, 2008)(Eighth Amendment claim resulting from injuries from prison ceiling collapse); McKnight v. McDuffie, No. 405-183, 2007 WL 1097280 (S.D. Ga. April 9, 2007)(Eighth Amendment claim resulting from injuries from prison bunk collapse); Barrand v. Donahue, No. 06-694, 2006 WL 2982051, *2 (N.D.Ind.Oct. 16, 2006)(Eighth Amendment claim resulting from injuries from prison ceiling collapse).

These cases all set exacting standards for establishing Eighth Amendment violations premised upon a failure to protect an inmate from a dangerous physical condition inside a prison, providing that in this setting:

> Deliberate indifference is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." A defendant "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." A defendant must have "actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner." Negligence does not satisfy the "deliberate indifference" standard, and it is not enough to show that a prison guard merely failed to act reasonably. Deliberate indifference can be inferred only where defendants know there is a strong likelihood rather than a mere possibility that violence will occur. Prison officials cannot be expected to eliminate the possibility of all dangers. Thus, the right to reasonable protection does not include the right to protection from random acts.

Barrand v. Donahue, No. 06-694, 2006 WL 2982051, *2 (N.D.Ind.Oct. 16, 2006)(citations omitted).

Judged against these standards, the Defendants do not seriously dispute that the acts alleged here–which involve knowingly permitting inmates to work near a furnace with heat in excess of 2,000 degrees while wearing clothing which was known to spontaneously combust–would not potentially rise to the level of deliberate

indifference to inmate safety. Instead, the Defendants contest this Eighth Amendment claim on different grounds. Relying upon *dicta* from several cases, the Defendants assert that they may not be held liable for any constitutional infractions because Petry volunteered to work in the prison boiler room. According to the Defendants, in this setting, where Petry chose to work in this particular job, prison officials may not be held liable for obvious workplace damages even if they were deliberately indifferent to those dangers. Thus, the Defendants invite us to find as a matter of constitutional law that "the mere fact that the powerhouse staff knew of the risk and did not prevent Petry's voluntary act is of no moment." (Doc. 27, p.18.)

We will decline this invitation for at least three reasons. First, we find that the Defendants' argument conflates two different actions–Petry's agreement to work in the prison boiler as part the "pit crew," with Petry's concerns regarding the conditions of his workplace. The gist of Petry's complaint does not relate to the fact of his prison job. Rather, it relates to the unsafe conditions of that work, and specifically to the risk of severe burn injuries resulting from wearing prison garb which would combust in the intense heat of the boiler room. It is only this latter issue–the safety of the conditions of the prison workplace–that lies at the heart of Petry's complaint. Therefore, Petry's alleged willingness to work in the boiler room, in general, does not resolve this claim.

Second, with the issue before the Court properly defined in this fashion we conclude that there are disputed and material facts relating to whether Petry, in fact, voluntarily agreed to work under the conditions which are alleged to have led to his burn injuries on November 28, 2007. Indeed, we note that Petry and the Defendants strenuously dispute this issue. Thus, Petry claims that he repeatedly voiced safety concerns regarding this flammable clothing, and was assured by prison officials that they were attempting to address those safety concerns, which they acknowledged. In stark contrast, prison officials deny even knowing that this concern existed, much less discussing the concern with Petry and other prisoners.[2] Since summary judgment is only appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c), these disputed factual issues regarding whether Petry willingly agreed to accept these risks of spontaneous combustion preclude summary judgment on behalf of the Defendants.

Finally, we believe that this argument fails because the mere fact that Petry voluntarily agreed to work in this prison job, as a matter of law, simply does not have

---

[2]Indeed, we note that there is some legal and factual tension in the Defendants' contrasting factual positions relating to this issue. The Defendants apparently take the position that the dangers of this job were so *patent* that Petry's act of accepting the job, in effect, constituted an assumption of this risk Yet, the Defendants simultaneously argue that the risks of this job were so *latent* that they were completely unknown to any corrections officials.

the type of wholesale, talismanic, preclusive effect that the defendants urge. Indeed, a number of courts have flatly rejected such claims, holding that the concept of voluntary employment in a prison setting–where correctional staff control virtually all aspects of the workplace and may use disciplinary processes to enforce compliance with workplace rules–does not, by itself, prevent an inmate's claim for injuries arising out of dangerously unsafe workplace conditions. See e.g., Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006); Bagola v. Kindt, 131 F.3d 632, 645, n.18 (7th Cir. 1997). In this highly regulated prison employment setting, these courts have recognized that "voluntariness ends at the point where cruel and unusual punishments begin." Id.; see also Smith v. United States, 561 F.3d 1090 (10th Cir. 2009). Furthermore, these cases all recognize that "the Eighth Amendment is implicated in the prison work context . . . when a prisoner employee alleges that a prison official [1] compelled him to "perform physical labor which [was] beyond [his] strength, [2] endanger[ed his life] or health, or [3] cause[d] undue pain." Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir.1994) (per curiam)." Morgan v. Morgensen,  465 F.3d 1041, 1045 (9th Cir. 2006). Moreover, in a setting where prison disciplinary rules enable corrections staff to sanction inmates who refuse to perform specific tasks, these cases all acknowledge that the issue of voluntariness assumes a factual dimension which may not be resolved on summary judgment. Id.

While the defendants insist that Petry's consent to work at this prison job now completely precludes his Eighth Amendment claim as a matter of law, the only appellate case they cite for this proposition, <u>Wooten v. Goord</u>, 123 F.App'x 441 (2d Cir. 2005), plainly does not support this broad view. Quite the contrary, in <u>Wooten</u> the court of appeals specifically held that: "We need not and do not hold that the voluntary nature of a prison work program necessarily precludes an Eighth Amendment claim based on work conditions." <u>Id</u>. at 443 (citing <u>Bagola</u>, 131 F.3d at 645 n.18 (7th Cir.1997)). Instead, the court's judgment in <u>Wooten</u> was narrowly fact-specific and relied, in large measure, upon a finding that the health risks facing inmates were minor, and that the inmates freely chose to face those risks, even after bringing their lawsuit, factual considerations that simply are not present here.[3]

In sum, in this case as a factual matter it is disputed whether Petry voluntarily chose to face the risk of severe burns resulting from wearing flammable clothes, or whether he protested the lack of safety clothing, but was instructed to work under

---

[3] Similarly, the district court cases cited by the defendants, <u>Ward v. Lamanna</u>, No. 04-11, 2007 WL 791130 (W.D. Pa. Mar. 14, 2007); <u>Siggers v. Lamanna</u>, No. 03-355, 2007 WL 791521 (W.D.Pa. Mar. 14, 2007); <u>Hill v. Lamanna</u>, No. 03-323, 2007 WL 776991 (W.D. Pa. Feb. 23, 2007);<u>Kelly v. Sapko</u>, No. 03-368, 2007 WL 805550 (W.D. Pa. Feb. 23, 2007), are inapposite since in each of these instances the court first found that the plaintiff inmates had failed to demonstrate a genuine objective risk to workplace safety, before also opining in *dicta* that the inmates' agreement to work in these setting also defeated their claims.

unsafe conditions. Furthermore, as a legal matter, it is apparent that questions concerning the voluntariness of an inmate's decision to work under conditions prescribed by prison officials do not prevent an inmate's claim for injuries arising out of dangerously unsafe workplace conditions. See, e.g., Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006); Bagola, 131 F.3d at 645, n. 18. Therefore, the Defendants have not shown that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, the Defendants' motion for summary judgment on this aspect of Petry's Eighth Amendment claim must be denied.[4]

### D.   Petry's State Tort Claims Fall Within a Statutory Exception to Sovereign Immunity

Finally, the Defendants seek summary judgment on Petry's state law negligence claims, arguing that sovereign immunity precludes these state tort claims against prison officials. In this regard the contrasting positions of the parties can be simply stated: The Defendants' sovereign immunity argument stems from the familiar proposition that the Commonwealth and its employees and officials enjoy broad immunity from most state law claims, immunity that is expressly embraced by statute,

---

[4]Finally, we note that the Defendants cite alleged conflicts between the statements of Petry and Inmate Carion on issues relating to workplace dangers as grounds for summary judgment in this case. The short answer to claim is that these alleged conflicts define disputed factual issues, they do not eliminate them.

which provides that: "it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. C. S. A. § 2310; see also Moore v. Commonwealth, 538 A.2d 111, 115 (Pa. Commw. 1988) ("In other words, if the Commonwealth is entitled to sovereign immunity under Act 152, then its officials and employees acting within the scope of their duties are likewise immune"). According to the Defendants, this grant of immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" Larsen v. State Employees' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008). Conduct of an employee is within the scope of employment if " 'it is of a kind and nature that the employee is employed to perform; [and] it occurs substantially within the authorized time and space limits . . . .' " Brautigam v. Fraley, No. 09-1723, 2010 WL 480856, *4 (M.D. Pa. Feb. 4, 2010) (Rambo, J.) In this case, Defendants contend that each of the Defendants are Commonwealth employees or officials, who were acting within the scope of their employment in committing the acts alleged in this complaint. The Defendants further insist that none of the narrowly crafted statutory exceptions to sovereign immunity apply here. Therefore, the Defendants

26

assert that they enjoy sovereign immunity on Petry's state law negligence claim and are entitled to summary judgment on this claim.

In response, Petry attempts to avoid the bar of sovereign immunity by arguing that the alleged negligence in this case falls within one of the recognized statutory exceptions to this immunity. Specifically, Petry asserts that the Commonwealth parties remain liable for any harm caused by "care, custody, or control of personal property." 42 Pa. C.S.A. 8522(b)(3). Asserting that "[c]learly the [combustible] clothing [worn by Petry] was personal property," (Doc. 30, p. 15), Petry argues that this statutory exemption applies here and defeats the Defendants' sovereign immunity claim.

Section 8522, of Title 42, Pennsylvania Consolidated Statutes provides a limited waiver of sovereign immunity in certain specific instances, stating that:

> **(a) Liability imposed.--**The General Assembly, . . . , does hereby waive, in the instances set forth in subsection (b) . . . , sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.

> **(b) Acts which may impose liability.--**The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**(3) Care, custody or control of personal property.--**The care, custody or control of personal property in the possession or control of Commonwealth parties, including Commonwealth-owned personal property and property of persons held by a Commonwealth agency, except that the sovereign immunity of the Commonwealth is retained as a bar to actions on claims arising out of Commonwealth agency activities involving the use of nuclear and other radioactive equipment, devices and materials.

42 Pa.C.S.A. § 8522 (a) and (b)(3).

"Because of the clear intent to insulate government from exposure to tort liability, the exceptions to immunity are to be strictly construed." Lockwood v. City of Pittsburgh, 751 A.2d 1136, 1139 (Pa.2000) (citation omitted).With this guiding principle in mind, we turn to the application of 42 Pa.C.S.A. § 8522 (a) and (b)(3) to torts that occur in a prison setting. The Pennsylvania courts have examined the application of §8522(b)(3)'s "personal property" exception to sovereign immunity in the context of prison tort claims on several occasions in different factual settings.  As construed by the Pennsylvania courts, this narrow exception to sovereign immunity applies to damages claims made by inmates for negligent damage to items of inmate personal property while that property is in the possession of Commonwealth parties. Williams v. Stickman, 917 A.2d 915 (Pa. Commw. Ct. 2007). Such claims are

permitted against the Commonwealth pursuant to §8522(b)(3).  In contrast, courts have rejected efforts by inmates to broadly claim that this exception to sovereign immunity applies to all prisoner personal injury claims, based upon the notion that the inmates themselves are in some fashion "in the possession and custody of Commonwealth parties." Gallagher v. Commonwealth, 545 A.2d 981 (Pa. Commw. Ct. 1988).

In instances where prisoners bring personal injury claims against Commonwealth parties, and seek to avoid the bar of sovereign immunity, in order to plead "a cause of action that falls within the personal property exception to immunity, for the exception to apply, the personal property *itself* must cause [the] injuries, not merely facilitate it. Warnecki v. Southeastern Pennsylvania Transportation Authority, 689 A.2d 1023 (Pa.Cmwlth.1997)." Pennsylvania State Police v. Klimek, 839 A.2d 1173, 1175 (Pa. Commw. Ct. 2003)(emphasis in original). Applying this standard, courts have held that the personal property exemption does not apply to tort claims based upon inmate attempts to harm themselves using personal property furnished by the state since, in this setting, the personal property merely facilitated the harm, it did not cause that harm. See, e.g., Pennsylvania State Police v. Klimek, 839 A.2d 1173, 1175 (Pa. Commw. Ct. 2003); Vargo v. Plum Borough, No. 06-1574, 2007 WL 1459403 (W.D.Pa. May 15, 2007). However, where a plaintiff alleges and shows that

the Commonwealth party's negligence with respect to some personal property "directly caused" an injury, §8522(b)(3)'s "personal property" exception to sovereign immunity applies and the plaintiff may maintain an action against these state actors. Pennsylvania State Police v. Klimek, supra; Gambo v. Commonwealth, No. 04-3318, 2005 WL 4346598 (Pa. Com.Pl. Aug. 26, 2005).

While the distinction between personal property that causes an injury and personal property that merely facilitates an injury is often easier to announce than to apply, in this case we conclude that Petry has sufficiently pleaded a negligence claim caused by the Commonwealth's personal property to withstand summary judgment. Fairly construed, Petry's complaint alleges that this personal property–flammable clothing–was the direct, immediate and proximate cause of his injuries when that clothing exploded in flames while worn by the Plaintiff during his work with the prison boiler pit crew. In short, this is not an instance in which the Commonwealth's property was simply an article that incidentally facilitated some harm. Rather, the Commonwealth's property was the immediate agent of that harm. In such instances, where "the personal property *itself* must cause [the] injuries, not merely facilitate it," Pennsylvania State Police v. Klimek, supra, we find that §8522(b)(3)'s "personal property" exception to sovereign immunity applies, and Petry may maintain this claim.

IV.     **Conclusion**

For the foregoing reasons, the Defendants' motion for summary judgment (Doc. 27) will be granted, in part, with respect to Petry's claims arising under the Pennsylvania Constitution, and with respect to all of Petry's claims against Supervisory Defendants Beard, Lawler, Harlow, Kauffman, and Yutzey. The Defendants' motion will be denied, however, as to Petry's remaining Eighth Amendment and common law tort claims.

So ordered this13th day of April, 2011.


*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

31